Before we start for the day's cases, I wanted simply to call to everyone's attention that Judge Rovner is also sitting with us. She is here by video, so the people arguing will see her on the monitor at the podium, and we can see her. And you can't see her, but you will hear her as she asks questions. So our first case for this morning is Straits Financial v. Ten Sleep. Mr. Stein. Good morning. May it please the Court. My name is Howard Stein, and I represent the appellant and cross-athlete Straits Financial LLC in this appeal. We have a very interesting case that presents a number of issues. I'd like to first focus on the mitigation issue. And obviously the panel may want to reverse my focus, but I think that's a clean issue, and we need to get right to it to see how the Court may wind up ruling on this. The issue here is, and it's undisputed set of facts, that the customer of a brokerage firm received multiple confirmations and statements of activity in his account after a time when he said to the broker, according to the Court and according to the customer, no more trading in my account. There's no question he got them. There's no question he understood them. We went through a lot of testimony. There's no question that— What does the evidence say about when he opened them? I'm sorry, your— What does the evidence say about when he opened them? When he opened? You mean what time he opened? Yes, when he opened the confirmations of the unauthorized trades. After much testimony, the trial court found that he did not actually know or open those trades until the accounts were liquidated in June 2012. Yes? Can you point to any case law in which the duty to mitigate was triggered in the absence of actual knowledge of the injury, such as based on either obstructive knowledge or willful ignorance? I mean, can you point to any? Well, we can, your Honor. First of all, there aren't a lot of cases about triggering it, and particularly in a situation like this, because most of these cases are actually arbitrated, and you don't get a lot of rulings on this. Most of the cases cited here are actually from the 80s, before the arbitration policies actually came into place. You're not going to see a lot of cases generally on this issue concerning that. But for example, we cited the Trippi case from the Southern District of New York, which actually was an appeal from an arbitration, where, among other things, the arbitration panel found, this is Trippi v. Prudential Securities, found that the customer, in fact, had not looked at his statements. He got them, didn't look at them, and, in fact, upheld the arbitrator's conclusion that there was a mitigation of damages. Southern District Court judge finding that, in fact, that that was sufficient. But that was something the arbitrators could do. Yes, but on the appeal- Arbitrators can do a lot of things that- Certainly, the arbitrators can do a lot of things and will do a lot of things. So what I am wondering is, once we accept the district court's finding of fact that Mr. Carter said, stop trading in this account, shut it down, which happens in the middle of March, if I remember correctly. Yes. And we accept that as a finding of fact that's not clearly erroneous. And he also knows that he still has the 33 hedge account, I'll call it. So the fact, even if somebody said to him, hey, these letters are coming in from Straits for you, he wouldn't have any particular reason to think that that was odd because he knows he has the 33 account with him. Why, once he's told them to shut it down, should he anticipate that they've just disregarded that instruction? Well, I would say multiple reasons. One, Your Honor, for example, there's not one or two of these that I can understand, but there's a total of, I believe it was 23, if I recall correctly. Why does that matter? I mean, it seems to me we're all subjected to a plague of mail from these things. And sometimes it's, you know, we're having a meeting or sometimes- The sheer number, if your argument is because there are a lot of them, he should have realized that the 35 account was actually contrary to his instructions being traded. I don't know why the number tells you that. Okay, obviously, the fact that he was not- This is a clean case because this is the only issue in the case, is that he obviously did not open, or at least that's the finding that he did not open. No, I take your point until June 20th. So what we have here is a situation where brokerage firms, which are strictly liable for the activities of their brokers, as a matter of law, under the Rosenthal case here, and as a matter of regulation, are required to send out these statements. And they do send out the statements, which clearly indicate the information that, in this particular case, for sure, I say don't trade. The statements say there's trades occurring in your account. That if the brokerage firms cannot rely upon that information, the costs in the system are going to be dramatically increased. Because what is a brokerage firm supposed to do in this case? I thought your managers were looking at this account with quite a bit of concern. There's no indication from- No? There was- They look at many accounts for many reasons. There was discussion about that. There's no finding by the district court that my client somehow was involved. Or knew of, or should have known. There's nothing like that found by the district court. We don't have any information like that. No, but in terms of- If we're talking about who's in the better position to avoid the costs here, you all are the sophisticated folks in the business, right? And you know what unauthorized trading can look like. Right. And you're the ones who hired Mr. Perkins. Right. That would go to the question of supervision. That's not the issue here. That claim was dropped in the case. This is a question of- Excuse me. This is a question strictly of the information that's gathered. The brokerage firm sends it out. If the cost at that point, at that point the information is even. So let me see if I get this straight though. To go back to your answer to Judge Rovner's question, it sounds like the answer to authority imposing a duty on a fraud victim to mitigate damages before having actual knowledge of the fraud is virtually non-existent. I would say it's also non-existent the other way also. Well, we have pretty general principles concerning duties to mitigate and contributory negligence not being a defense to fraud and so on, which all seem to apply here. So are you asking us in essence to say that because of the particulars of the commodity futures trading industry, there are some special rules that come into play? We should modify those common law principles? I think the fact that this is a commodity, or for that matter a securities trading situation, clearly is the trigger for this. And the reason for that is that once that information goes out to the client and is available in clear form, and that's not disputed in this case, we now have an evening of the possibility on both sides of determining whether or not there's a fault. What's the cost to the customer? He opens the document. That's it. What's the cost to the brokerage firm, however, to confirm that the client hasn't gotten the document, doesn't understand it? They now, if the statement itself is not enough to trigger responsibility on the customer, the brokerage firms now have to undertake substantial additional cost in the form of calling customers. How do you know a customer hasn't opened a statement? There's no way to do that without doing it. You've got thousands and thousands of customers. I thought it was, how often do you have brokers engaged in unauthorized trading? Well, but you would never know that, Gerard. Is it happening a lot? No. My client's never had this situation before. The record was, this is the only case that's ever been brought against my client. Certainly, again, that might be a factor that might tip it over. We're not saying that as a matter of law, the mere receipt of a statement triggers the duty. I'm not saying that. What I'm saying is that it can trigger the duty on behalf of the client to under the circumstances of this case and potentially other cases. Judge Roker has a question, I think. I do. I'm sorry. Look, the related account authorization indicates that the account will use all existing agreements maintained and existing on file with Straits. But where is the evidence that the RJO agreement was maintained and existed on file with Straits other than the assignment agreement between RJO and Straits, which was not sent to Ten Sleeper Corridor? What about that? Well, I think that's a different issue in the mitigation, but- It is. Yes, but to answer the question- I'd like- You know, I'm afraid that the time will go and I won't get answers. Absolutely, Your Honor. I think the answer to that question is pretty simple. Number one, there was evidence in terms of it being actually on file at Straits. The compliance director, as well as other people, testified that when the assignment occurred from RJO to Straits, all the documents in connection with those accounts were also transferred to Straits. In fact, that actually says that in the assignment agreement itself. We maintained those documents. In fact, the compliance director at Straits testified that she actually reviewed all those statements to determine the completeness of those agreements. So you're saying that they were sent to Ten Sleeper Corridor? I'm sorry, Your Honor. No, they were not sent to Ten Sleeper Corridor. No, we've never claimed that they were sent to Ten Sleeper Corridor. I thought your position was that you didn't even have any duty to notify them. Yeah. We can come back to this, but just while we're in the business of throwing questions out at you before this is over, I would like to understand why opening a totally speculative account, such as the 35 account, didn't materially alter the risks that Mr. Carter bore as a guarantor. It seems to me that at least has to go out the window, because he thought he was guaranteeing a hedge account, which is a risk reducer, not a speculative account, which is a risk enhancer. Right. Again, from our viewpoint, there's a difference between the assignment and the related account documentation. And maybe this doesn't go to Mr. Carter's personal guarantee. Yeah, I'm talking about his personal guarantee. You have the related account, the RAA, but guarantees don't just carry over by operation of law if there's a substantial material change in the risks. That is a good statement of the law. However, I think in this case, because of the nature of the guarantee, which said all They all say that, but he thought he was guaranteeing a hedge account, which is not the same thing. Well, that guarantee did not say you're guaranteeing a hedge account. That's not what it says. It says you're guaranteeing all liabilities. It's not specifically limited to the 33 account. And that's why that language is important in the particular guarantee. So no matter what he guaranteed, he could have guaranteed all of Strait's accounts for everybody. And you would have said, well, we've just added that into the No, that's clearly not correct. He's the president of Tensley. He's not the president of XYZ Company. The president who signed the related account agreement. So it's not as if he's But he was told it was a hedge account. He was told what was a hedge account? The 35. Isn't that what it's called in the papers? No, the 35 account is a speculative account. Yeah, I know it was, in fact, a speculative account. I'm saying you can't the normal law and guarantees, even when they're transferable, as if it turns into something significantly different. It doesn't carry over by operation of law. Right. And in this case, the fact, and again, we're talking specifically about the guarantee, not about the related account agreement as it affects the customer agreement. On the specific question of the guarantee, I agree that that's a different situation because he didn't sign off on the related account agreement as an individual. He signed it as president of Tensley. But I think the language of the guarantee agreement, which anticipates having liabilities beyond those specifically known at the time he signed the guarantee, as broad as that is, covers the additional potential loss from a different account that he executed in that case. Mr. Stein, if we were talking about just your client's original claim, and we were debating the fine points of the documents, maybe it works, maybe it doesn't with the assignment, with the broad language in the guarantees. Given the district court's findings of fraud, however, I don't quite understand what the nuances in the documents matter. They would matter if the trial court had examined that issue, because the defenses that are set out in the contract, which is similar to the defenses in this court and Spocker case versus Henderson, of ratification and estoppel based upon the customer agreement. But doesn't ratification and estoppel, don't they require actual knowledge? Not in a contractual base. We did not argue what I call common law ratification and estoppel. So you're saying that Mr. Carter, when he signed these documents, was agreeing that you would have a good defense to fraud if he didn't open his mail. That's not... Isn't that what that amounts to? Not, I think that's not a fair statement of it, and I'll tell you why. Because the document simply says, as does essentially every document in the commodities industry, every customer agreement in the commodities industry, says that if you don't object to trades in your account within a certain time frame, whatever it says in the document, you are bound to ratify those trades. And this court has held in Nijbocker that that language is not in any way violative of public policy or anything else. That is viable language, and that's what language is in this document. So the parties by contract have changed what might be the common law definition of ratification to mean you get the statement, you don't object, you're deemed to have ratified. They can do that. Let me follow up if I could on that. Sure. Because of one thing that's been fairly significant in the federal courts here in Chicago over the last 10 years in this industry has been the sentinel bankruptcy. Yes. Half a billion dollars or more in losses. And in that case, it turned out there were lots and lots of legal protections against fraud by futures commodity merchants, but they're not perfect. And who your partner is in a contract matters. Character matters. And that's why I'm very troubled by the assignments and the failure of Straits Financial to document its relationship with Mr. Carter and his company directly. You know, you're relying on guarantees given to somebody else. Who knows, you know, how reliable this new partner is going to be?  That's a common way of dealing with things in the commodity industry, number one. And number two, there's a reason for it. It's because there is when brokers change firms all the time. That's just a fact of the matter. And when they change firms, almost always they bring their customers along because most customers want to have that broker handling their account. So there's already a relationship established with the underlying broker. And therefore, the documentation that was entered into with a prior brokerage firm is often accepted by the succeeding firm, let's call it, in order to save the cost of re-documenting. You know, sometimes people want to go on and trade commodities very next day. In this case, for example, it took weeks before the documents went back and forth to Mr. Carter. You know, he's not at home half the time. You know, to get back there, it could be weeks. If he wants to enter a trade, he can't do it until there's an account agreement, in fact. That's what happened here. They did that. And it's not a—the testimony was it's, you know, it's not universal, but it's certainly not uncommon. It happened—in fact, some of these documents, not from Mr. Carter, were actually from two firms before because Mr. Carter had actually gone to RJO from another firm. And RJO had accepted that firm. I believe it was called Cadence. Cadence documentation. So we have on the record here, really, three documents, three sets of brokerage firms through which some of these documents passed. So we have a situation here, and, you know, look, could this be a situation where, you know, had Mr. Carter just one time opened the document and looked at it? No question, that triggers it. If there's a situation where Straits had called him up, but we don't—that's not our facts. That doesn't mean that we're not right on either the facts or the law. There was fraud here. That was determined by the district court. But there's no determination, and this distinguishes our case even further, there is no determination whatsoever that Straits was participatory in any manner in that fraud. So when we get down to—other than as a matter of strict liability, we're liable only because he engaged in this fraud. Perkins was terrible. So Judge Rover can ask a question, but I'm also going to point out that he's well into his rebuttal time. Yes. But go ahead, Judge Rover. Yeah, okay. Look, the assignment agreement between RJO and Straits, okay, it specifies that it is assigning both the accounts and any related agreements, including the customer agreement, but the letter to Tensleep stated only that it was transferring the account with no mention whatsoever of the agreement. Yes. So of course I'm wondering, why shouldn't the failure to mention the agreement in that notice to Tensleep be considered a lack of notice that the RJO agreement was also assigned? Okay, for two reasons. One, Your Honor, number one, that is a standard form agreement used in the industry. It only refers—and that's all that the customer has to agree is to have his account transferred. Secondly, we pointed out that under that related— But you don't have to—it's so known that you don't have to state it at all. Is that what you're saying? I'm saying that as a matter of industry practice. That document, it's a form that's used throughout the entire industry. It's called a negative consent letter, and it's just—that's what it says. In fact, it follows almost verbatim the language of the rule, the CFTC rule, that allows that. So our point on notice, Your Honor, is that in the related account agreement, and this goes to all those cases that were a subject matter of discussion during the course of the briefing, that the recorded account agreement, by reference to other accounts on file, is specific enough to have put them on notice. What does that mean if there's not another account agreement on file? You're signing a document that doesn't mean anything. The court's been very clear that you're not going to interpret a document to be meaningless. So that's our position on that, Your Honor. If you would like to save the rest of your time for rebuttal— I probably have a couple minutes left, so I probably should. It's not very much, but you may save it if you wish. I'm sorry? You may save the rest of your time for rebuttal if you wish. Thank you very much, Your Honor. Ms. Hendrickson. You may please the court. I'm Nancy Hendrickson. I represent the Appellees and Cross Appellants, Ten Sleep Cattle Company and Richard Carter. So my opening question for you, Ms. Hendrickson, is related to the question that Judge Rovner just asked. I don't understand how you can assign an account in the abstract without assigning the underlying agreement. There are all sorts of things in account agreements, such as what the charges will be and how much margin needs to be around. Is it your position that Ten Sleep and Carter just thought they had this sort of disembodied account floating around with no contractual terms related to anybody? No, that's not our position. But keep in mind— So what's the agreement, then? Well, there's no requirement that there be a written agreement under the Commodities Exchange Act regulations that we cited. What agreement did he think he had? Apparently, there were some favorable aspects of the RJO agreement that Straits continued because it was an inherited agreement. Well, I think, quite simply, the agreement that he thought he had was that you will follow my instructions. When I tell you to trade my account, you trade it. When I tell you to stop trading my account, you stop trading it. For what fee? For what fee? Whatever the posted fee was. There's been no evidence that the fees at RJO and Straits were the same. So I don't know because that wasn't explored at trial. But there's no requirement that there be a written account agreement. And so the fact that the related account authorization is potentially rendered meaningless if it doesn't incorporate the Straits agreement is irrelevant. And really, it's on them because they're the ones who control the document drafting and— Well, I'm not so sure. I mean, they send the negative consent letter. It gets moved. Perkins is still the broker, sad to say. And so you're portraying this as kind of an agreement-free world, a law-free world that somehow it's possible to divorce the account from the underlying agreement. I'm not seeing how you can do that. I'm not seeing that at all, Your Honor, because the basic agreement between a firm and the customer is that you will follow my instructions. So how do we know what kind of an account it is? You know, if after the transfer, if Perkins had decided to handle the 33 account as just kind of fun money, how do we know that that would have been in any way beyond the scope of any agreement? By the paperwork that was filled out, which indicated that it was a hedge account. Well, so you're saying that the RJO paperwork did transfer over then? Well, physically— because actually there's a lot in the RJO agreement that doesn't help your client, such as the ability to offset, such as, you know— Right. No, we are very definitely saying that the RJO agreement as a physical document was not validly assigned vis-a-vis the 35 account, which is what the district court found. So in other words, anything in that RJO agreement that protected Mr. Carter is also out the window. Because if there's no agreement, there's no agreement. Well, potentially that is correct. You can't possibly say that the good parts transferred over and the bad parts didn't. What the district court did was say, look, if all that had happened was that the 33 account had transferred over, that probably would have been a valid assignment. Why? Why does that make sense? Because there was no— If what we're worrying about is whether the underlying agreement is also part of the assignment process. Because the mere transfer of the account from one futures commission merchant to another one didn't materially increase Tensleep's risk. That's all that had happened was that the 33 account moved from one firm to the other, and there had been no unauthorized trading and nothing bad happened in the account if Perkins had done what he was supposed to do. Well, we of course wouldn't have a lawsuit if that had happened. Well, of course not. And we all wish that were the case. That's what Judge Zagel said in paragraph 8 of his findings and conclusions, that the initial assignment is not invalid just because of the fact that Tensleep didn't get notice. And that's not what our argument is. And I understand that. I'm just saying that accounts aren't like, you know, portraits or something. You know, if you assign the ownership of an account, it really is a creature of agreement. You know, its purpose, its scope, the amount of money, the duties. And it's not just sort of some thing that hangs out there in the abstract. That's true. But Straits is a Futures Commission merchant registered with the CFTC and the NFA and is obligated to follow all those rules and regulations. And that also becomes part of the party's contractual relationship. So there are two other things. Oh, go ahead. Carter spoke with Perkins by phone at least 17 times. Between March and June. That's correct. Is there any evidence that they discussed the 35 account? Was it Carter's practice to conduct all business with Perkins by phone? Or was mail or email also used? They spoke 17 times. They never discussed the 35 account at all. That was the testimony in the record from Mr. Carter and Mr. Perkins acknowledged that that's true. They did conduct all their business by phone. Mr. Carter doesn't use email. He doesn't text. He's not a computer literate person. So Mr. Carter's only point of contact with Straits was Mr. Perkins. And it was always by phone. And between March 16 and June 20 of 2012, was Carter at his residence where he could have seen the notices that were sent by Straits? No, the evidence was that most of the time, Mr. Carter was out of town. But most of the time is what Judge Rovner is asking. Is there like a day that he's at home? Oh, here and there. There were times that he could have opened. Right, but the testimony was that all of his waking hours were tending to the cabs who were going through the cabbing season. I know he was usually not there, but that's not the question. No, that is true. He was home at certain times. Yeah, but I'm trying to quantify certain time. A day, two days, a week. The testimony was that he was consumed with his cattle herds. And we didn't develop in the record specific dates and times when he was home. But if you look at the phone records, it can show you roughly where Carter's movements were during that time period. So I would like you to address two things with respect to all of this. One of them is the date after which the duty to mitigate arose. The district judge says some of this is on him. And then as far as I can tell, the district judge took a dart, threw it at the wall, and it wound up on June 10th. And I can't find an explanation for that. I feel as though perhaps factual development on that issue was necessary because I think the judge is correct that some of this is on Mr. Carter. I find it troublesome that he never opened his mail. And I also find it, let's just say notable, that the minute he finds out that there's a problem around June the 20th, all of a sudden people are sitting in his lawyer's office who presumably is a person who is sophisticated enough to figure out that something's amiss. So where does June 10th come from? Why shouldn't we at least have a factual exploration of perhaps the days when he was at home? When did his duty to exercise some diligence on his own part actually arise? Well, the duty arose on June 20th when he actually discovered the fraud. But he may have, but see here's the point of this whole system under the commodities futures trading system. Things don't always go the way they should. So in the middle of March, he says shut down the 35 account. He gives that instruction. But the system has a fail safe in it, which is that the broker is supposed to, the FCM is supposed to send these notices. And so for those slippages which occur, which clearly seems to have happened here, he could have found out very promptly that his clear instruction was being disregarded. By Perkins. And all he had to do was pick up his phone and call somebody, call straights, tell Perkins, you know, whatever, and say, I told you to shut this down. You're not doing it. And more could have happened. Well, that argument is saying that Carter had a duty to exercise due care and due care is not- Because he has this commodities account. He has, I mean, you know, if I just took my bank statements and regularly threw them in the wastebasket, then it would behoove me very poorly to complain that the bank never told me I was overdrawn if the bank was in fact trying to tell me I was overdrawn. I mean, I'm troubled by his choice not to look at these statements. Well, from his perspective, the account was shut down and it was furthest thing from his mind because he was preoccupied with the work that needed to be done on the ranch. But I want to get to the cases that talk about this obligation on the part of a futures commission merchant to notify the customers about their duty to report problems with the account. And this is reflected in a number of cases cited by both sides, the Sherwood versus Matta trading case, the Anspacher case. And what those cases say, that the burden to inform the customer of their duty to complain is on the firm. And that warning must be clear and unequivocal. And the only warning that is in evidence here is what's set forth in the RJO agreement. Well, but somehow you're saying that straights can't comply with that obligation by just mailing him a letter. Obviously, you can't email him either because he doesn't use email or texting. Well, they could have called him. So who? They could have called him. I mean, Perkins was calling him. Right, but let's not forget that this- Who else was supposed to call? Straights Compliance Department, Straits Risk Manager. They've got an account that is not only a hedge account for trading cattle futures. And instead, what it has in it is wildly speculative trading in very large naked positions of US Treasury bond futures. So where is it? I mean, I recalled that some place there was an indication that this 35 account was a second hedge account. Where do I find that? It's, I can't recall the exhibit number off the top of my head, Your Honor. I can file something supplemental to that, but it is in the record. There are emails. There's a form that Mr. Perkins filled out. And then the Chief Compliance Officer of Straits sent an email to Mr. Perkins. And she said, is this another hedge account? And he texted, he emailed back, yes. So this is in the internal. You don't need to tell me exhibit numbers. I mean, I remembered reading that. But somehow the evidence is that Carter thinks it's, I mean, there's something weird about this, right? Because the $300,000 in the middle of March gets handled very much off the books, gets handled with a check being sent to him and half of the payment going back to Perkins. He knows it's not a hedge account. That's not the way he's handled his hedge accounts. Well, that's true. But he also doesn't know that what Perkins is doing even at that point is illegal. Ms. Hendrickson, I don't know that I've ever seen a fraud case where it was not possible to criticize the victim for having failed to take some measure that might have prevented the fraud along the way. There are a number of different checks and balances in place here. And it's possible to get around all of them or hope that the victims will be preoccupied with calving or other businesses. So I'll make that an observation rather than a question. Okay. Right. And just to get back to my point, that Straits had more information at hand than Mr. Carter did. The only information Mr. Carter had were these daily statements, which weren't even called trade confirmations. They're called daily statements. But he doesn't know what's in the envelope. I take it that the record shows that had he opened one of these envelopes he would have seen that it was the 35 account and it was being traded, that there was a transaction that day. And then there are a couple of monthly statements that come along too. And I mean, you can tell me if you disagree with that, but I thought that what I was being told was that had he opened it, he would have understood them. He did say that, but the context I think is important. He didn't truly understand what the statements were showing him. In hindsight, he now understands that, oh, I should have caught that. But he did say that on the record. I will concede that. But- Is he totally uneducated? He has a high school education. He has a high school education. But he's been a cattle rancher all his life. But I want to emphasize that Straits had more information at hand than Mr. Carter did. But what should Straits have told him and how should they have told him from March forward? Well, backing up before March- No, no, I'm asking- For March forward? For March forward, we have what Straits understands is a fairly typical assignment of an account from one FCM to another. And the broker has moved. And so people do that. And there are these negative consent letters. I understand you think none of that is adequate, but that's how it got there. And you seem to have agreed that there's somehow some kind of an agreement. I still can't quite figure out how, but there's something that says you'll work for me. How should Straits have notified him that the trading was going on in the 35 account? And that he was getting huge margin calls in that account? They should have called him. And he was told about the margin calls by Perkins. But he was told that they were for the other account. But he didn't think there were going to be margin calls, I think he was, I thought, for the hedge account. That's right. He didn't think there would be margin calls for the 35 account. Or the 33. No, no, no. He did know that there would be margin calls for the 33 account. So that raised no alarms for him at all. So when Straits- Not even the volume? No, no. And the reason for that is because during this time period, cattle prices were kind of volatile. But as far as how Straits should have notified him, call him up. That's what most firms do. When they see trading that's outside the parameters that they have in their files, this is supposed to be a cattle hedging account, Mr. Carter, why are you, why do you have so many naked long positions in U.S. Treasury bond futures? Why isn't that your negligent supervision theory? Pardon me? That really at root says that Straits should have been doing something to oversee Perkins' activity that they failed to do. And their failure to do that meant that the phone call that you're talking about never happened. Well, we dismissed that claim. That's what I'm saying. But the evidence is still relevant to our consumer fraud claim. And also to this issue about whose burden is it? Who's at fault here? And to hold Mr. Carter to a negligence standard, which I think is improper under the law in the cases that we cite, it should work both ways. Didn't Straits have a duty to mitigate when it had all this information available to it that it just completely disregarded? And while it just kind of watched the values in the account plummet until it was finally negative, almost $2 million, never pick up the phone to call the customer to say, is this really what your intentions were? Ms. Hendrickson, we're being told that if we agree with you, we're going to be undermining commodities trading because the poor merchants will be vulnerable to sophisticated clients who don't react to losing trades until it's clear that they have turned out to be losing trades. How seriously should we take that risk? Well, these are always fact-specific cases. And if you're dealing with a sophisticated trader, that's going to factor into the analysis. But as we note in our briefs, it's never going to be to the customer's advantage to know about an unauthorized trade that is losing money and to sit there and continue to watch it as it's losing money, hoping that it turns out for the best. That's not in the customer's best interest and that would not be rational behavior. It's very unclear to me how, you know, kind of at what point Straits should have done something different. If all of these things had happened and RJO had been the broker, would you be here? Well, with all due respect, I don't think this would have happened at RJO. Well, I mean, but you never know. You never know. There are bad apples everywhere. You never know. Perkins may have been a bad apple. I think we would still be here. So in other words, the transfer doesn't mean anything because with RJO, the original account agreement was there. Mr. Carter signed it. Well, it's a difficult hypothetical because there's a lot of assumptions that would have to be made. What assumptions? You know, I'm just trying to figure out how important the nature of the underlying agreement is to you and how important the subsequent behavior of the unauthorized trades is. So if we hypothesize that we just pull out this one step, it never moves from RJO to Straits. It just stays at RJO, but it's Perkins and Perkins convinces him to open the second account and Perkins ignores his instruction to stop trading, et cetera. All of the rest of the things stay the same. What difference in your view? Well, again, it's just hard to imagine that scenario because there would presumably be, one would hope that the lax supervision in this case would be the exception and not the rule. Well, but I'm asking you because as a matter of law, I'm trying to figure out how important your arguments are about notice or lack thereof of the underlying account agreement. Well, it is important. Because there wouldn't be any issue if it had all stayed at RJO. Right, and the Sherwood versus Matta trading case and others that we cite say the burden is on the firm to notify the customer of their duty to object. And here- That's in the agreement. The agreement says- That's in the agreement, but it's also got to be on the conference. If you look at the Anspracher case, there the court said, well, you know what? Your con firm isn't good enough to put the customer on notice of their duty to complain because it's inconsistent with your account agreement. Because the account agreement said, call our compliance department if you have an unauthorized trade. In your agreement it says, call our firm immediately if you have a problem. And the court said, that creates an ambiguity that relieved the client of the obligation to timely complain. And in that case, the customer actually prevailed in that case, except for with respect to certain trades that occurred after the customer started talking to firm management and the broker was out of the picture. You know, I have been wondering about this. Carter had access to a lawyer at least after June 20th when he learned of the unauthorized trading. Is there any evidence that he used a lawyer in setting up the 33 and 35 accounts and in signing the papers for these accounts? No, there's no evidence of that and that's not what happened. No, no. There is no evidence of that? There's no evidence that, I'm sorry. No, I'm just wondering how you know it never happened, if there's no evidence. Well, because the testimony was that Mr. Perkins. What? Well, based on the testimony and the records and evidence, there's no evidence that Mr. Chapman was involved in any respect and he wasn't. I want to address one of the points that you raised as far as whether we need to remand this case for a hearing on when the duty to mitigate arose. You know our position. It arose on June 20th. But to the extent the court disagrees with that, there's no need to remand the case for that hearing because the District Court already made a determination. Well, I know the District Court said it was June 10th. Right. But I was looking for a reason, you know, like what happened on June 10th or what, you know, how did it silt up to creating a duty to mitigate at that point? Why not June 9th? You know, why not June 1st? Well, I think I can understand reasons that might push back into March. I could understand a theory that might say, you know, he was simply not at home and unavailable until April the 17th, you know, or I'm just making up dates. Right. You know, I could see potentials for lots of dates, but I can't figure out what fact lies behind June 10th. And the District Court didn't tell us, but you can obviously affirm on any reason that's supported in the record and the fact that we point to. That's supported in the record. Well, the last unauthorized trade was on June 4th. If hypothetically we did, we understand your position, we should push it out to June 20th. But but for the sake of discussion, you know, if we think there is some earlier date. So the last recorded trade is June 4th. So how do we get to the 10th from there? Well, the last unauthorized trade was on June 4th. And if you figure that it takes about a week for the mail to get from Chicago to Tensleep, Wyoming, perhaps that was what was in the District Court's mind. We don't know. But we also know that the District Court heard evidence and was urged by Straits to consider and accept several other alternative dates. And the District Court rejected those dates. They urged the court to say April 5th was the day because that was the day that the last position was put on that led to the losses. And the District Court heard that evidence, heard the argument, rejected it. Straits urged the court to adopt May 10th as the date because if you look at the phone records, evidently Mr. Carter was in or near his home on that date. Heard evidence, heard argument, rejected that. But doesn't really tell us why not and why June 10th is better? Well, Straits has not pointed the court to anything in the record that would be a better date other than the dates that the court's already considered and rejected. And it just gets to the fundamental problem here was that the District Court found that the date to mitigate arose before the date that Carter actually had knowledge of the fraud. So it looks like a rough compromise that may or may not stand up on an appeal. But it may have been a break for Straits financial that he didn't go all the way to June 20th, but then we get an appeal and you can file your cross appeal and raise the issue. Again, I'm out of time I see, but our position is that June 20th is the correct date and the case should be remanded for entry of judgment in the full amount of tenant sleep losses. Thank you. All right. Thank you very much and we do understand that's your position, I assure you. Mr. Stein, anything further? Just a couple of points in response to questions that the court raised. Number one, if you look at page 45 of our initial brief citing to joinings of the 23, it actually does set out the dates of which Mr. Carter was home or near his home during the time period and there are multiple dates where he's at. That's from cell towers? Yeah, these are just simply from cell towers and he admitted that. Not a common kind of evidence in commodities trading fraud. No, your honor, but that was the evidence. I believe divorce proceedings are starting to use them. No, but he actually said that because of his, having a cell phone like that, that's how he got to his cell phone usage by using the cell tower. Of course, yeah. So there's no question he's home on these dates. So do we all, yeah. Okay, so I wanted to answer that question and I also wanted to talk briefly about the question that your honor raised. It's an important issue for the industry. It is important that, in fact, and I know there's a view here that he's a victim of fraud and therefore he gets pretty much anything he wants to. He is a victim of fraud. Please don't challenge that. We're not disputing that that's what the trial court found. But in fact, in this particular circumstance, if the choices between do you allow this to happen, which has an impact on the industry by virtue of the fact that they are, Straits is going to have to pay any debit to the clearinghouse. The clearinghouse, I'm sorry, to the exchange. The exchange has to pay the clearinghouse. This is a domino. You saw that in the Sandok case. That was one of the issues that you talked about in that kind of case. And if you can't rely upon customers doing the absolute minimum of doing this, yes, it is a choice between Straits and Tensleave. I will agree with that. But in fact, when the information at that point is exactly equal, we will argue that it is. Mr. Carter said, I don't understand these statements real well, but I can tell you for I, he said, absolutely for sure. I know that seeing that statement in there means that there was trading going on the account. And I told him not to trade. That's all. We're not asking him to figure out what is proper law. That's right. But the problem, the problem, the problem is we have to choose at least as you frame it between the principal who hired the fraudster and the victim of the fraudster. In a normal situation, that would be true. But again, the information now has been brought to a level playing field. We're not talking about an initial hiring of this person. We have a level playing field that both sides. Now, Mr. Carter has the same information. Well, in essence, neither side is opening the envelope or looking behind. No, because we don't know this side deal. We don't know he's got a side deal with Carter. How are we supposed to know this? Well, it was oral, right? And it was still legal. It was oral. There's no evidence whatsoever that we know about it. No, but you have access to the fact that this trading is just bizarre, right? And you know there's a second account. Yeah, treasury bond futures for a guy who's raising cattle in Wyoming. Now, he's entitled to do that if he wants to do it. But he made $300,000 off of it. And then lost $2 million. Well, no, I understand. But it's a whole history. OK. Thank you very much. Thank you. All right. Thank you very much. Thanks to both counsel. We'll take the case under advisement.